**TARTER KRINSKY & DROGIN LLP**
*Attorneys for NYC Constructors Inc., et al.*
*Debtors and Debtors-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Arthur Goldstein, Esq.
Rocco A. Cavaliere, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                                    Chapter 11

NYC Constructors Inc., <u>et al.</u>,                     Case No. 16-10069 (SCC)

                                   Debtor.
-----------------------------------------------------------x

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND RULES 2002, 4001 and 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING USE OF CASH COLLATERAL, (II) AUTHORIZING INCURRENCE BY THE DEBTORS OF POSTPETITION SECURED INDEBTEDNESS WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND WITH ADMINISTRATIVE SUPERPRIORITY, (III) GRANTING LIENS ON THE DEBTORS' ASSETS, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING TO CONSIDER THE MOTION**

TO:    THE HONORABLE SHELLEY C. CHAPMAN,
       UNITED STATES BANKRUPTCY JUDGE

NYC Constructors Inc. ("<u>NYCC</u>") and MRP, L.L.C. ("MRP" and collectively with NYCC, the "<u>Debtors</u>") debtors and debtors-in-possession, hereby file this motion pursuant to sections 105(a), 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et seq.</u> (the "<u>Bankruptcy Code</u>") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an interim order (the "<u>Interim Order</u>"), a copy of which is annexed as **Exhibit "A"** and a final order (the "<u>Final Order</u>") authorizing the Debtors to (i) use cash collateral of the senior secured pre-petition lender, Banker Steel Co., L.L.C. ("<u>Banker Steel</u>" or

"Prepetition Lender"), (ii) incur postpetition secured indebtedness from Banker Steel in its capacity as a debtor in possession lender (in such capacity, the "DIP Lender"), on an administrative superpriority basis over all prepetition secured indebtedness, (iii) grant liens to the DIP Lender on all of the Debtors' assets, (iv) granting certain adequate protection to the Prepetition Lender; (v) modify the automatic stay to the extent necessary to effectuate the terms and provisions of the debtor in possession financing and the associated orders, and (vi) schedule a final hearing to consider the relief requested in this Motion.    In support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

As more fully set forth in the Declaration of Barry King in Support of the Petition and First Day Relief (the "First Day Declaration"), which is incorporated herein, the Debtors have been suffering from a liquidity crisis.  They need use of cash collateral and post-petition financing in order to maintain and preserve the Debtors' business operations and preserve over 300 jobs, pending a sale of the Debtors' assets to the stalking horse purchasers or another party submitting a higher or better offer.   The DIP Facility (as defined below) will provide cash with which the Debtors can continue operations and maintain relationships with vendors, subcontractors, materialmen, and service providers.  The DIP Facility will also provide the funds and time the Debtors need to undertake a section 363 sale process.  It is critical, therefore, that the Debtors be authorized to enter into the DIP Facility to rectify its liquidity issues and preserve the value of the Debtors' businesses.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§157 and 1334, and the order of reference, dated July 10, 1984 (Ward, C.J.) as amended by the Amended Standing

Order of Reference dated January 31, 2012 (Preska, C.J.). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein are §§ 105(a), 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014.

## BACKGROUND

2.    On January 14, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and intends to continue in the operation of its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.    NYCC is engaged in the erection of structural steel at large construction projects in New York City. MRP, in turn, operates a steel fabrication facility in New Jersey for a number of contractors, including NYCC.

4.    Additional information about the Debtors and their operations is located in the First Day Declaration, filed contemporaneously with the Debtors' bankruptcy petitions.

## SUMMARY OF PREPETITION AND POSTPETITON FINANCING

5.    In accordance with Bankruptcy Rule 4001(c) and Rule 4001-2(a) of the Local Bankruptcy Rules for the Southern District of New York, the principal elements and material provisions of the Interim Order and the DIP Credit Agreement (defined below) are summarized below as follows:[1]

---

[1]    The following section merely provides a short summary of the key provisions of the Interim Order and the DIP Credit Agreement. Reference is made to the foregoing documents for a complete recitation of the actual terms.

A. **Prepetition Secured Financing, Use of Cash Collateral, and Adequate Protection**

6.        The Debtors' prepetition secured lender is Banker Steel pursuant to a promissory note and security agreement in the aggregate principal amount of $2,000,000 (the "Prepetition Note"), in which Banker Steel obtained liens on all of the Debtors' prepetition assets (the "Prepetition Collateral").   Banker Steel, in its capacity as the Prepetition Lender, has consented to the Debtors' use of cash collateral (the "Cash Collateral") pursuant to and in accordance with the Approved Budget (as such term is defined in the DIP Credit Agreement), a summary schedule of which is annexed to the Interim Order, and the terms of the Interim Order and Final Order, respectively.  For the avoidance of all doubt, the Interim Order contains stipulations by the Debtors with respect to the Prepetition Lender's security interest in the Debtors' Cash Collateral and all proceeds thereof. See Interim Order, ¶ E(v).

7.        Further, paragraph E of the Interim Order includes various stipulations (the "Debtors' Stipulations") whereby the Debtors have stipulated, among other things, that (i) the Debtors entered into the Prepetition Note and obtained a secured term loan in the aggregate principal amount of $2,000,000, (ii) the total amount outstanding under the Prepetition Note as of the Petition Date was $2,000,000, plus accrued and unpaid interest, fees, expenses and disbursements, and indemnification obligations (the "Prepetition Secured Obligations"), without objection, offset, defense or counterclaim and not otherwise subject to avoidance, (iii) the Debtors granted the Prepetition Lender liens on and security interests in all of the Debtors' assets (the "Prepetition Secured Liens") which are valid, binding, enforceable, non-avoidable and properly perfected, and (iv) the Debtors acknowledged that the validity and priority of the Prepetition Secured Liens and the Prepetition Secured Obligations and otherwise waived, discharged and released the Prepetition Lender and its affiliates, agents, attorneys, officers, directors from any

challenge or offset the Debtors may have had to the Prepetition Secured Note, Prepetition Secured Obligations, and Prepetition Secured Liens. See Interim Order, ¶ E(i) – (iv).

8.    Notwithstanding the Debtors' Stipulations regarding the Prepetition Secured Note, Prepetition Secured Obligations, Prepetition Secured Liens, and the Prepetition Lender's interest in Cash Collateral, the Interim Order preserves for the statutory committee of unsecured creditors, if one is appointed, or any other party in interest, a period of fifty (50) days from the entry of the Interim Order, unless otherwise extended by the Prepetition Lender (the "Challenge Period"), to investigate and otherwise challenge any of the Debtors' Stipulations. See Interim Order, ¶ 7(a).[2]  In the event of a challenge, the Interim Order provides that the Prepetition Lender may, subject to section 506(b), charge the Debtors with its costs and expenses, including reasonable attorneys' fees, incurred in defending the objection or complaint against the Prepetition Lender. See Interim Order, ¶ 7(b).  Further, the Interim Order prohibits the use of the DIP Facility, DIP Collateral (as defined below), Cash Collateral, and Carve-Out (as defined below) against the interests of the DIP Lender and/or without its consent, provided however that in the event of a challenge, an aggregate amount not to exceed $15,000 of the DIP Facility (subject to the entry of the Final Order), may be used by the Committee, if any, to investigate the Prepetition Secured Liens within the Challenge Period. See Interim Order, ¶ 9.

9.    The Interim Order contemplates the priming of the Prepetition Secured Liens on the Prepetition Collateral pursuant to section 364(d) of the Bankruptcy Code in favor of the DIP Facility provided by the DIP Lender.  The Prepetition Lender is the same entity as the DIP Lender and for the avoidance of all doubt, has consented to the priming of its interests by the DIP Facility.   In

---

[2]  The Debtors believe that the Challenge Period is appropriate under the circumstances. The Prepetition Secured Obligations are evidenced by a single note and security agreement and standard perfection documents.  Additionally, the Challenge Period is not arbitrary; it is designed to ensure that any potential challenges regarding the Prepetition Secured Obligations are raised prior to the sale hearing.

exchange, the Prepetition Lender is being provided adequate protection for any diminution in value of its interests in the Prepetition Collateral (including Cash Collateral) resulting from the subordination to the Carve-Out (defined below) and the DIP Liens (defined below), and the imposition of the automatic stay solely to the extent of any such diminution in value. See Interim Order, ¶¶ J, 4. The Interim Order makes clear that any adequate protection liens shall be deemed valid and perfected without the necessity of any filing or recording of any financing statement. See Interim Order, ¶ 6(a).

### B.  The DIP Facility

10.    The following information is intended to highlight certain key provisions of the DIP Facility (defined below):

#### i.    Terms of DIP Facility

11.    In order to preserve the value of the Debtors' business as a going concern, including satisfying payroll and other necessary expenses, pending a sale of the Debtors' assets to the highest and best bidder, Banker Steel, in its capacity as the DIP Lender, has offered to lend the Debtor $3,000,000 (the "DIP Facility") pursuant to that certain Debtor in Possession Loan and Security Agreement (the "DIP Credit Agreement") annexed to the Motion as **Exhibit "B"**, and all other agreements, documents, and instruments to be executed and/or delivered with, to, or in favor of DIP Lender (collectively, with the DIP Cred Agreement, the "DIP Financing Documents"). Each of the Debtors is a borrower under the DIP Credit Agreement and are jointly and severally liable for all of the obligations under the DIP Credit Agreement. See DIP Credit Agreement, § 8.14. All use of Cash Collateral is limited to the amounts approved under the Approved Budget and in accordance with the Interim Order and Final Order, subject to a 15% variance in the manner set forth in the DIP Credit Agreement. As set forth in the Approved Budget, the Debtors seek interim financing of

$2,000,000 in the first 25 days under the Approved Budget, pending the Final Hearing to consider the Motion.

12.     Subject to the terms of the DIP Credit Agreement, the proceeds of the DIP Facility shall be used to fund (a) working capital and other general corporate purposes of the Debtors, (b) certain allowed administrative costs and expenses of the Chapter 11 cases, and (c) interest, costs, fees and other transaction expenses owing to the DIP Lender, including DIP Lender's professional fees and expenses, in each case of clauses (a) and (b) above, solely in accordance with the Approved Budget. See Interim Order, ¶ 2(d).  In the interests of full disclosure, as set forth in the Approved Budget, approximately $200,000 per month will be disbursed by the Debtors to their Canadian non-debtor affiliate for engineering, drafting, and accounting services provided by such entity to the Debtors in the ordinary course of business.

13.     The interest rate in the DIP Credit Agreement is 12 percent per year on the outstanding balance of the DIP Facility, provided that following an Event of Default, the DIP Credit Agreement shall bear interest at 14 percent per year until such Event of Default is cured or waived. See DIP Credit Agreement, §§ 1.1, 2.7.   Aside from the foregoing, the DIP Credit Agreement provides that on the closing date of the DIP Credit Agreement, the DIP Lender shall be entitled to a fully earned and non-refundable (a) closing fee equal to $60,000 (which is equal to 2.0% of the aggregate principal amount of the $3,000,000 loan commitment), (b) monthly collateral monitoring fee of $500, payable in advance, and (c) an unused line fee calculated at a rate per annum equal to .50% on the average daily unused portion of the loan commitment, payable monthly in arrears. See DIP Credit Agreement, § 2.15.  In addition, the Debtors may prepay all or any portion of the outstanding principal and accrued interest, at any time, by delivery of same to the DIP Lender without premium of penalty. See DIP Credit Agreement, § 2.09.   Moreover, the DIP Credit

Agreement includes a mandatory prepayment provision whereby the DIP Loan Obligations must be prepaid immediately upon the Debtors' receipt of proceeds of any sale, transfer or conveyance, any debt issuance, any extraordinary event such as an insurance payment, and upon receipt of accounts receivable on the terms and in the manner set forth in the DIP Credit Agreement. See DIP Credit Agreement, § 2.10.

14.      Finally, the DIP Facility established by the DIP Financing Documents shall mature and be due and payable upon the earlier of (i) the six month anniversary of the date the DIP Credit Agreement was entered into or (ii) the date of the occurrence of an Event of Default. See DIP Credit Agreement, § 1.1.

## ii.      **Protections Granted the DIP Lender**

15.      The Interim Order, if approved, will, pursuant to sections 364(c) and (d), grant to the DIP Lender liens (the "DIP Liens") on all of the Debtors' assets, including their Prepetition Collateral (the "DIP Collateral"). The Interim Order does not permit the DIP Lender to obtain liens on avoidance actions and proceeds thereof under sections 544 through 550 of the Bankruptcy Code, provided however that it is contemplated that avoidance actions and their proceeds shall not be considered DIP Collateral until the entry of the Final Order. See Interim Order, ¶ 2(f). The DIP Liens shall be first, valid, prior, perfected, unavoidable and superior to any other lien on the DIP Collateral, subject only to the Carve-Out. See Interim Order, ¶ 2(h).

16.      Aside from DIP Liens on the DIP Collateral, the DIP Financing Documents also contemplate that subject only to the Carve-Out, the Debtors' obligations (the "DIP Loan Obligations") to the DIP Lender shall, pursuant to § 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise, be an allowed superpriority administrative expense claim over any and all administrative expenses of the kind specified in §§ 105, 326, 328, 330, 331, 503(a), 503(b), 507(a),

507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code. <u>See</u> Interim Order, ¶ 2(i).

17.     Further, subject to the entry of the Final Order, neither the DIP Collateral nor the Prepetition Collateral shall be subject to section 506(c) of the Bankruptcy Code. <u>See</u> Interim Order, ¶¶ K, 11. In addition, the Interim Order provides that subject to the entry of the Final Order, the Prepetition Lender and DIP Lender shall each be entitled to all the rights and benefits of section 552 of the Bankruptcy Code and that "the equities of the case" exception under section 552 shall not apply to the DIP Lender or the Prepetition Lender or any of the DIP Collateral or Prepetition Collateral. <u>See</u> Interim Order, ¶ 18(g). Moreover, the Prepetition Lender and DIP Lender shall not be subject to the equitable doctrine of "marshalling" or any other similar doctrine with respect to any Prepetition Collateral or DIP Collateral, as applicable. <u>See</u> Interim Order, ¶ 18(f).

18.     Finally, pursuant to the Interim Order, each of the Prepetition Lender and DIP Lender shall have the right to credit bid the amount of all accrued loan obligations at any sale of the Debtors' DIP Collateral, including the Prepetition Collateral. <u>See</u> Interim Order, ¶ 5(a) and (b).

### iii.     **Carve-Out**.

19.     All liens and claims granted under the Interim Order shall be subject to the Carve-Out which shall mean: (i) quarterly fees required to be paid to the United States Trustee pursuant to 28 U.S.C. § 1930(a) and any fees payable to the clerk of the Bankruptcy Court; (ii) all allowed professional fees incurred by professionals retained by the Debtors and the Committee in the period prior to the occurrence of a Triggering Event (the "Pipeline Period") not to exceed the amounts for professionals set forth in the Approved Budget for such period, less any amounts actually paid in respect of fees and expenses incurred during the Pipeline Period; and (iii) upon the occurrence of a Triggering Event, an aggregate amount of allowed fees incurred after the Triggering Event not to

exceed $125,000, which amount shall not be reduced by amounts paid during the Pipeline Period. The term "Triggering Event" is defined to mean the date that DIP Lender provides notice to the Debtors of the occurrence of an Event of Default and the DIP Lender's termination of the Pipeline Period for purposes of the Carve-Out. See Interim Order, ¶ 8. The Carve-Out does not include any wind-down expenses to chapter 7 or 11 trustees and their professionals.

iv.    **Events of Default and Remedies**.

20.    The occurrence of any of the following shall constitute an "Event of Default": (i) the occurrence of an "Event of Default" under the DIP Credit Agreement, (b) the failure by the Debtors to observe or perform any of the terms, provisions, conditions, covenants or obligations under the Interim Order, (c) the reversal, vacatur or modification of any provision of the Interim Order, or (d) the failure of the Debtors to obtain entry of the Final Order on or before 25 days after the Petition Date.  See Interim Order, ¶ 15, see DIP Credit Agreement, § 6.1 (listing numerous "Events of Default").

21.    Upon the declaration of an Event of Default, the DIP Lender may exercise its rights as a secured creditor, provided however that it provides 5 days written notice of an Event of Default to counsel to the Debtors, counsel to the Committee, and the United States Trustee. See Interim Order, ¶ 16.

(v.) **Debtors' Covenants**

22.    Article 4 of the DIP Credit Agreement includes various customary affirmative covenants of the Debtors, including but not limited to covenants regarding the Debtors' payment of taxes, maintaining insurance, provision of financial, collateral, and bankruptcy reports to the DIP Lender, and compliance with the Approved Budget.  Furthermore, the Debtors agreed to cause its non-debtor Canadian affiliate to use best efforts to cause Double D Drafting Inc. to comply with all

obligations and services provided by such entities to the Debtors in furtherance of the Debtors' business.  See DIP Credit Agreement, § 4.16.

23.    Section 4.10 of the DIP Credit Agreeemnt, along with its associated Schedule 4.10 includes various "Sale Milestones" that the Debtors agreed to, including (i) filing a motion to sell assets within one day of the Petition Date, (ii) entry of a bidding procedures order within 21 days of the Petition Date, (iii) scheduling of an auction within 65 days of the Petition Date, (iv) entry of a sale order within 70 days of the Petition Date, and (v) closing on the sale within 75 days of the Petition Date.

24.    Article V of the DIP Credit Agreement includes a number of negative covenants which are fairly standard for debtor in financing agreements, which, generally prohibits the Debtors from taking any action which negatively impacts their businesses and assets and the liens provided to the DIP Lender.

## RELIEF REQUESTED AND BASIS FOR RELIEF

25.    By this Motion, the Debtors seek interim and final orders to obtain the use of cash collateral and debtor in possession financing in order to preserve and maintain the Debtors' operations, pending a sale of the Debtors' assets.

### A.    The Debtors Should Be Authorized to Use Cash Collateral

26.    For the reasons set forth herein, the Debtors require use of Cash Collateral to provide working capital.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

The trustee may not use, sell, or lease cash collateral…unless-

(A) Each entity that has an interest in such cash collateral consents; or
(B) The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c). Further, section 363(e) provides that "on request of an entity that has an interest in property…proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

27.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e) and should be authorized to use the Cash Collateral.  Importantly, here, the Prepetition Lender has consented to the use of cash collateral, subject to the Approved Budget and the Carve-Out and in accordance with the terms of the Interim Order and Final Order.  In exchange, paragraph 4 of the Interim Order provides the Prepetition Lender with various forms of adequate protection.  Among other things and consistent with section 361 of the Bankruptcy Code, the Prepetition Lender will receive replacement liens in the Debtors' collateral equal to any diminution in value of the Prepetition Lender's security interests and liens in the Prepetition Collateral. See In re Worldcom, Inc., 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy").

28.    Adequate protection may be provided in various forms, including granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis. See, e.g., In re Realty Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's

collateral during the period when such collateral is being used by the debtor.  See In re 495 Central

Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is

to safeguard the secured creditor from diminution in the value of its interest during the chapter 11

reorganization.").

29.    In light of the adequate protection provided to the Prepetition Lender, the Debtors

have appropriately provided for any diminution in the value of the Prepetition Lender's interests in

the Prepetition Collateral.  The Debtors believe that the adequate protection proposed herein and in

the Interim Order is fair, reasonable and is sufficient to satisfy the requirements of section 363(c) of

the Bankruptcy Code.

### B.  The Debtors Should be Authorized to Enter into the DIP Facility

30.    Section 364 of the Bankruptcy Code provides, in pertinent part, as follows:

(c) If the trustee is unable to obtain unsecured credit allowable
under section 503(b)(1) of this title as an administrative
expense, the court, after notice and a hearing, may authorize
the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of
the kind specified in section 503(b) or 507(b) of this
title;
(2) secured by a lien on property of the estate that is not
otherwise subject to a lien; or
(3) secured by a junior lien on property of the estate that is
subject to a lien.

(d) (1) The court, after notice and a hearing, may authorize the
obtaining of credit or the incurring of debt secured by a senior or
equal lien on property of the estate that is subject to a lien only if-
(A) the trustee is unable to obtain such credit otherwise; and (B)
there is adequate protection of the interest of the holder of the
lien on the property of the estate on which such senior or equal
lien is proposed to be granted.

11 U.S.C. 364(c), (d)(1).

(i)    The Debtors could not obtain unsecured financing,

**and the terms of the DIP Facility are fair and
reasonable under the circumstances.**

31.     Generally, § 364(c) of the Bankruptcy Code requires a debtor to demonstrate that

alternative sources of credit are not available under other provisions of § 364. See, In re Ames

Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990); 495 Central Park Avenue Corp., 136

B.R. at 630. Although there is "no duty to seek credit from every possible lender before concluding

that such credit is unavailable," the statute obligates a debtor to show "by a good faith effort that

credit is not available without a senior lien." Bray v. Shenandoah Savings & Loan Assoc. (In re

Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (9th Cir. 1986); see also In re YL West 87th Holdings I

LLC, 423 B.R. 421, 441 n. 44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of

"reasonable efforts" to obtain credit otherwise).

32.     Against this statutory backdrop, the court should evaluate the facts and

circumstances of the Debtors' cases, and should accord significant weight to the necessity for

obtaining financing, see, e.g., Snowshoe, 789 F.2d at 1088; Ames, 115 B.R. at 40. For example, the

need for a swift injection of cash to preserve a debtor's business satisfies the requirements of

§364(c) of the Bankruptcy Code when coupled with unsuccessful attempts to locate alternative

financing. See, Ames, 115 B.R. at 40.

33.     Provided that an agreement to obtain secured credit does not run afoul of the

provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable

deference in acting in accordance with its sound business judgment in obtaining such credit. See,

e.g., In re Barbara K. Enters., Inc., 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. June 16, 2008)

(explaining that courts defer to a debtor's business judgment "so long as a request for financing does

not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in

interest."); Ames, 115 B.R. 40 ("[C]ases consistently reflect that the court's discretion under section

364 is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest."); In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment.").

34.     To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Dura Auto. Sys., Inc., 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

35.     The Debtors' decision to enter into the DIP Facility represents the sound business judgment of the Debtors and warrants approval by the Court. In determining whether the Debtors exercised sound business judgment in entering into the DIP Facility, the Court may consider the economic terms of the DIP Facility in light of current market conditions. The Debtors do not believe that financing on less onerous terms than provided in the DIP Financing Documents is available. The Debtors believe that in light of the nature of the Debtors' assets and the construction industry, the 12 percent interest rate on account of a short term DIP Facility is a market rate. It is simply not possible for the Debtors to obtain unsecured credit on favorable terms. Further, the procurement of a secured loan from a traditional third party bank is futile because the Debtors do not maintain many hard assets; indeed, the Debtors' only true assets are their rights to receivables from construction projects. Notably, however, traditional lenders are often leery of providing financing to contractors in the construction industry in recognition of the fact that a contractor's receivables are often trust fund monies belonging to subcontractors and materialmen. Further,

because of the Debtors' precarious liquidity issues, awaiting a lengthy loan and commitment approval process from a traditional lender was simply not an option.

36.    Courts have found that where there are few lenders likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd 99 B.R. 117 (N.D. Ga. 1989).    This fact holds true here.  Aside from the lack of a traditional third party lender/bank, there are few, if any, strategic steel contractors in New York, with the financial wherewithal, to commit to the DIP Facility on a short term basis. Further, adding to the complication of obtaining another third party lender, whether traditional or strategic, such financing would require the Debtors to pursue relief under section 364(d) of the Bankruptcy Code in order to "prime" the Prepetition Lender.  Meanwhile, under the current DIP Facility, the Prepetition Lender is prepared to accept a second priority security interest and otherwise consents to the priming of its liens on the Prepetition Collateral, but only in the event of the DIP Facility.  In other words, if the Debtors were to pursue alternative financing, the Prepetition Lender would likely object, thereby requiring the Debtors to carry their burden under section 364(d) of the Code, after an expensive contested proceeding.  Based on the foregoing, the Debtors' management and the Debtors' Chief Restructuring Officer believe that the proposal set forth in the DIP Financing Documents is the best financing available to the Debtors.

37.    Moreover, the various fees and charges associated with obtaining the DIP Facility are within the range of reasonableness under the circumstances.  Courts recognize that lender fees are often the only way to obtain financing, and routinely approve them.  See, e.g., Resolution Trust Corp. v. Official Unsecured Creditors' Comm. (In re Defender Drug Stores, Inc.), 145 B.R. 312, 316-19 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 that included a

lender "enhancement fee"). Here, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lender in exchange for providing the DIP Facility. The Debtors believe that these fees and the other obligations under the DIP Financing Documents represent the most favorable terms to the Debtors on which the DIP Lender would agree to make the DIP Facility available. The Debtors considered the fees discussed above when determining, in their business judgment, that the DIP Financing Documents constituted the best terms on which the Debtors could obtain postpetition financing necessary to continue its operations and proceed with their chapter 11 cases.

> **(ii)     Entry into the DIP Facility is necessary to preserve assets of the estates and is in the best interests of creditors.**

38.     The Debtors believe that the DIP Lender is offering postpetition financing on competitive terms that will be capable of being swiftly implemented which is necessary for the Debtors' continued operations and payment of employees, as well as the preservation of value for the benefit of all parties in interest. The Debtors and their advisors have analyzed, reviewed and conducted a detailed investigation into the Debtors' projected financial needs during the Chapter 11 cases, and determined that the Debtors would require postpetition financing to support their operational and restructuring activities. Indeed, the DIP Facility will provide immediate access to capital to pay their customers, employees, vendors, subcontractors, materialmen, and service providers. The DIP Facility further supplies the liquidity to support the marketing and sale process, and establish prudent cash balances for a business of the Debtors' size and stabilize operations.

39.     Failure to obtain the DIP Facility would gravely harm the Debtors and their stakeholders. Again, as stated, the Debtors are not able to obtain unsecured credit allowable solely as an administrative expense, and no lender would be willing to accept a second priority lien on the Debtors' assets behind the Prepetition Note. Absent the DIP Facility, the Debtors' operations may cease, resulting in a significant diminution in the value of the Debtors' collateral, leading to a

potential fire sale at liquidation value rather than going concern value.

40.    In sum, in the Debtors' business judgment, entry into the DIP Financing Documents is appropriate to preserve the value of the Debtors' assets and their operations for the benefit of all constituents.

### C. The Scope of the Carve-Out Is Appropriate

41.    The proposed DIP Facility provides that the liens of the Prepetition Lender and DIP Lender shall be subordinate to the Carve-Out. The Carve-Out, in turn, provides sufficient funds under the Approved Budget, both prior to and after any "triggering event", to protect this case from administrative insolvency. The Carve-Out is similar to other terms created for professional fees that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. See Ames, 115 B.R. at 40.

42.    Without the Carve-Out, the Debtors' estates or other parties-in-interest may be deprived of possible rights and powers because the services for which professionals may be paid is restricted. Id. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

### D. The DIP Lender should be Deemed a Good Faith Lender

43.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the

pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

44.     As explained herein and in the First Day Declaration, the DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing for a short period of time.  The negotiations concerning the DIP Facility were at arm's length and in good faith.  The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility are to be used solely for the purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP Lender is a "good faith lender within the meaning of section 364(e), and is thus entitled to all of the protections afforded by that section.

### E.  Modification of the Automatic Stay is Warranted

45.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to: (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lender and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, (ii) permit the DIP Lender to exercise certain remedies, upon the occurrence and during the continuance of an Event of Default, but only after the expiration of the applicable grace period, if any, or the occurrence of the Maturity Date, as applicable, and (iii) implement the terms of the proposed Interim Order and Final Order.

46.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities, and in the Debtors' business judgment, are appropriate under the circumstances, as they will provide the Debtors and other parties reasonable time to cure or contest an event of default.  See e.g., In re Chassix Holdings, Inc., Case No. 15-10578 (MW) (Bankr.

S.D.N.Y. Mar. 13, 2015) [Docket No. 67]; In re Great Atlantic & Pacific Tea Company, Inc., Case

No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2010 [Docket No. 43]; In re The Reader's Digest

Assoc., Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26].

Accordingly, the Debtors request that the Court authorize a modification to the automatic stay in

accordance with the terms set forth in the Interim Order.

### F.  The Debtors Satisfy Bankruptcy Rule 6003(b)

47.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid

immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a

claim that arose before the filing of the petition" prior to twenty-one (21) days after the Petition

Date.  Fed. R. Bankr. P. 6003(b).  The Debtors require immediate access to the interim funding

allowed under the DIP Facility.  Based on the foregoing, the Debtors submit that the relief requested

herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003

is satisfied.

### G.  Waiver of Bankruptcy Rules 6004(a) and (h)

48.    To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### NOTICE AND REQUEST FOR PRELIMINARY HEARING

49.    In accordance with Rule 4001(c) of the Bankruptcy Rules, the Debtors will provide

notice of this Motion by telecopy, email, overnight mail, or hand delivery, upon (i) the Office of the

United States Trustee for the Southern District of New York; (ii) the Debtors' twenty (20) largest

unsecured creditors, on a consolidated basis, (iii) counsel to the Prepetition Lender and the DIP

Lender, (iv) Banker Steel, (v) all known parties asserting a lien against the DIP Collateral; (vi) the

Internal Revenue Service, (vii) the Securities and Exchange Commission, (viii) the United States Department of Justice; and (ix) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

50.    In accordance with Rule 4001(c)(2) of the Bankruptcy Rules, the Debtors request that the Court hold a preliminary hearing no later than 2 business days after the Petition Date at which time the Debtors will request authority to utilize cash collateral and to borrow funds in the amount of up to $2,000,000 on an interim basis pending a final hearing on the approval of the DIP Financing Documents.  Absent immediate and temporary financing, the Debtors may be forced to cease operations.

51.    The Debtors further request that the Court set a date that is no later than 25 days after the Petition Date as a final hearing for consideration of entry of the Final Order.  The Debtors intend to mail the notice of final hearing to the Notice Parties by first class mail, and respectfully request that the Court consider such notice sufficient under Bankruptcy Rule 4001(c)(2).

52.    No previous application for the relief requested herein has been made to this Court or any other Court.

**WHEREFORE**, for all of the foregoing reasons, the Debtors respectfully request that the

Court grant the relief requested in the Motion and grant the Debtors such other and further relief as

this Court deems just and proper.

Dated: New York, New York
       January 14, 2016

                                    **TARTER KRINSKY & DROGIN LLP**
                                    *Attorneys for NYC Constructors Inc., et al.,*
                                    *Debtors and Debtors-in-Possession*


                                    By:    /s/Scott S. Markowitz
                                           Scott S. Markowitz
                                           Arthur Goldstein
                                           Rocco A. Cavaliere
                                           1350 Broadway, 11th Floor
                                           New York, New York 10018
                                           (212) 216-8000